UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| ANTHONY S. TRIGONA and KATHLEEN D. TRIGONA, | : : : : : | Bankruptcy No. 08-70806 BM Doc. # 73: Plan of Reorganization |
| Debtors | : | Small Business Chapter 11 |

## MEMORANDUM OPINION

Cranberry Financial, L.L.C., which is the sole member of one the classes provided for in debtors' chapter 11 plan of reorganization and is impaired, has voted against the plan. Debtors seek to have the plan "crammed down" despite Cranberry Financial's rejection of the plan.

Debtors' plan will not be crammed down for reasons which follow and therefore will not be confirmed.

## FACTS

Debtors, who are husband and wife, are self-employed. They sell cabinets for installation in public housing projects and also own and manage a building in which they lease space to commercial tenants.

Debtors filed a voluntary joint chapter 11 petition on July 24, 2008. Included among the assets listed on the schedules were their personal residence and the commercial property.

Lehman Brothers Bank was identified as having a first mortgage lien against the commercial property. Lehman Brothers Bank assigned the mortgage and note to

Cranberry Financial on September 9, 2008, approximately six weeks after the petition date. Cranberry Financial thereafter filed a proof of claim in which it stated that the debt owed totaled $146,284.12. Debtors did not object to the proof of claim.

The schedules also identified Cambria County Tax Claim Bureau as having a secured claim for unpaid property taxes dating back to 1998 which related to the commercial property. Cambria County Tax Claim Bureau thereafter filed a proof of claim wherein stated that the amount of the debt totaled $188,064.85. Debtors did not object to the proof of claim.

Prior to assigning its mortgage lien to Cranberry Financial, Lehman Brothers Bank filed a motion for relief from the automatic stay pertaining to the commercial property. A consent order resolving the motion issued on November 17, 2008. Among other things, debtor agreed to make adequate protection protection to Cranberry Financial in the amount of $1,803.00 per month and to make adequate protections payments to Cambria County Tax Claim Bureau in the amount of $1,800.00 per month. Debtors are current on these payments.

Debtors have filed a plan of reorganization consisting of fifteen classes, six of which are not relevant to the question whether debtors' plan is feasible. Class 2 has a secured claim in the amount of $38.67 which debtors propose paying in full thirty days after the effective date of the plan. Debtor's objection to the claim of the sole member of Class 5 was sustained immediately prior to the hearing on plan confirmation. Classes 9 and 15 have no members. Class 11 is comprised of tenants with unexpired leases in the

commercial property which debtors propose to assume. Class 14 is comprised of debtors' two sons with subordinated general unsecured claims whom debtors propose personally paying after Class 13 is paid. Debtors' proposed treatment of these classes will not be considered here.

Of the remaining nine classes, Classes 1, 3, 4, 6, 7 and 8 are comprised of creditors with allowed secured claims. Debtors propose paying them the full amount of their allowed claims with interest over durations of varying years. These creditors will retain their liens until their claims are paid in full.

Class 1 is comprised of Cambria County Tax Claim Bureau with a tax lien against the commercial property. Debtors propose paying it $1,741.80 per month. Class 3 is comprised of the claim of First National Bank, which has a first mortgage lien against debtors' residence. It is to receive payments in the amount of $94.34 per month. First National Bank, also the sole member of Class 4, has a second mortgage lien against the residence. Debtors propose paying it $743.02 per month. Cranberry Financial, the sole member of Class 6, has a mortgage lien against the commercial property. Debtors propose paying it $1,803.00 per month. IRS is the sole member of Class 7 and has several tax liens for unpaid federal income taxes. Debtors propose paying it $2,020.37 per month. Pennsylvania Department of Revenue is the sole member of Class 8 with tax liens for unpaid sales and income taxes. Debtors propose paying it $681.29 per month.

Class 10, of which debtors' counsel is the sole member, is comprised of administrative claims allowed under § 503(b)(2) of the Bankruptcy Code. Counsel is to be paid in full in an amount allowed by the court. To the extent his claim is not paid in full within thirty days of its allowance, counsel will be paid over time along with Class 13 from a plan disbursement account which debtors will fund. Details of the fund will be discussed below in connection with the proposed treatment of Class 13.

Class 12 is comprised of the unsecured priority tax claims of Pennsylvania Department of Revenue and IRS. They will be paid in the aggregate amount of $559.98 per month.

Class 13 is comprised of creditors with timely-filed general unsecured claims. Creditors in Class 10 and Class 13 will be paid in the amount of $1,000.00 per month which debtors will deposit in a plan disbursement fund under the control of their bankruptcy counsel.

The above monthly payments debtors propose making to the above classes total $8,643.80 per month ($1,741.80 + $94.34 + $743.02 + $1,803.00 + $2020.37 + $681.29 + $559.98 + $1,000.00 = $8,643.80).

With the exception of Class 11, all classes provided for in debtors' proposed plan are impaired, as the term is defined at § 1124 of the Bankruptcy Code.

The court was informed at the hearing on plan confirmation that all impaired classes except Class 6 had voted in favor of the plan. Cranberry Financial had voted to reject the plan. Although it had not filed a written objection to confirmation of debtors' plan with the

court, counsel for Cranberry Financial appeared at the hearing and raised various objections to its confirmation.

In response to its objections, debtors orally amended the proposed treatment of Cranberry Financial. While holding fast to the proposal to pay it $1,803.00 per month and to the proposed annual rate of interest, debtors proposed reducing the maturity date of their obligation to Cranberry Financial, with payment of the remaining balance due in full at the end of the fifth year.

At the request of the court, debtors and Cranberry Financial submitted briefs in support of their respective positions.

The matter is now ready for decision.

## DISCUSSION

Certain requirements must be met before a chapter 11 plan can be confirmed. It shall be confirmed, for instance, only if:

> (8) With respect to each class of claims or interests –
> (A) such class has accepted the plan; or
> (B) such class is not impaired under the plan; [and] ….
> (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed under the plan.

11 U.S.C. § 1129(a).

Subsection 1129(a)(8) has not been met here. Cranberry Financial, the sole member of Class 6, is impaired under and has voted to reject the plan. It does not necessarily

- 5 -

follow from this, however, that debtors' plan cannot be confirmed. The seemingly categorical language of § 1129(a)(8) is not so categorical after all. An exception to the provision is found at § 1129(b)(1) of the Bankruptcy Code.

Under this provision, the court shall confirm a plan at the request of the plan's proponent if: (1) all other applicable requirements of § 1129(a) with the exception of §1129(a)(8) are met; (2) the plan does not unfairly discriminate; and (3) the plan is fair and equitable. 11 U.S.C. § 1129(b)(1). In the vernacular of bankruptcy law, a chapter 11 plan can be "crammed down" in spite of its rejection by an impaired class when these three requirements are met.

The requirement that a chapter 11 plan be fair and equitable for cramdown purposes is set forth at 11 U.S.C. § 1129(b)(2). It provides in relevant part as follows:

> (2) For purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
> (A) With respect to a class of secured claims, the plan provides ---
> (i)(I) that the holders of such claims retain the liens securing such claims ..., to the extent of the allowed amount of such claims; and
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;...[or]
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1229(b)

Cranberry Financial opposes a cramdown of debtors' proposed plan for two reasons. According to Cranberry Financial, requirements (1) and (3) of § 1129(b)(1) as set forth above are not satisfied in this instance. It maintains that § 1229(a)(11) is not satisfied in

- 6 -

this instance because debtors' proposed plan more likely than not will be followed by debtors' further financial reorganization or by liquidation of their assets. In addition, Cranberry Financial maintains that its proposed treatment is not fair and equitable, as the concept is characterized at § 1129(b)(2).

We initially will address the contention that the first of the above-enumerated requirement of § 1129(b)(1) is not satisfied in this instance.

### Is Debtors' Plan Feasible?

The purpose of § 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more than the reorganized debtor is capable of delivering after confirmation. *Pizza of Hawaii, inc. v. Shakey's, Inc. (Matter of Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985).

The phrase "not likely to be followed" appearing in § 1129(a)(11) is critical in determining whether a chapter 11 plan is feasible. It indicates that success in carrying out the plan need not be guaranteed. *Danny Thomas Properties II, LLC v. Beal Bank (In re Danny Thomas Properties II, LLC)*, 241 F.3d 959, 963 (8th Cir. 2001). The bare possibility that a plan might fail is not fatal to its feasibility. All that is required for purposes of feasibility is a reasonable prospect of success. *Id.* 241 F.3d at 963.

Relevant factors for determining whether a plan is feasible may include: (1) the adequacy of a debtor's capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matters which bear on the prospect

of a sufficiently successful operation to enable performance under the provisions of the plan. *Teamsters National Freight Industry Negotiating Committee v. U.S. Truck Co.(In re U.S. Truck Co.)*, 800 F.2d 581, 589 (6th Cir. 1986).

The proponent of a plan bears the burden of proving, by a preponderance of the evidence, that it is feasible within the meaning of § 1129(a)(11). *Financial Security Assurance, Inc. v. T-H New Orleans Limited Partnership (Matter of T-H New Orleans Limited Partnership)*, 116 F.3d 790, 801 (5th Cir. 1997).

Circumstances present in this case lead us to conclude that debtors' proposed chapter 11 plan most likely is not feasible. Specifically, the requirement set forth in § 1129 (a)(11) is not satisfied.

The effective date of the plan will occur thirty days after the order confirming it becomes final and no longer is subject to appeal. It was pointed out previously that proposed payments to Class 1, 3, 4, 6, 8, 10 and 13 total $8,643.80 per month.

How do debtors propose coming up with this amount every month? According to debtors' plan, they will continue to operate their cabinet-making business and will continue to manage and lease space to tenants in the commercial building they own. The plan makes no provision for debtors to obtain financing from another source to fund their monthly payments.

The question arises whether the anticipated future net profits derived from the cabinet-making business and from leasing space to tenants in the commercial building support a finding that debtors' plan has a reasonable prospect of succeeding.

The only items bearing on this question are debtors' operating reports for nine months beginning in July of 2008 and ending in March of 2009 which they have filed with the court. They offered nothing at the hearing on plan confirmation which might bear on the issue of plan feasibility.

The monthly operating reports showed net profits totaling $40,172.50 for five of these months and net operating losses totaling $24,727.56 for the other four months.

Debtors' net profits exceeded net losses during this nine-month period by $15,444.94 ($40,172.50 - $24,727.56 = $15,444.94).

Debtors' monthly average net profit during this nine-month period was $1,716.10 ($15,444.94 ÷ 9 = $1,716.10). This amount is $6,927.70 per month less than the amount of monthly payments called for in debtors' plan ($1,716.10 - $ 8,643.80 = $6,927.70).

Pursuant to the consent order dated November 17, 2008, debtors have made adequate protection payments to Cambria County Tax Claim Bureau and to Cranberry Financial totaling $3,603.00 per month. Debtors evidently are current on these payments.

What is not clear from debtors' monthly net profits and losses for the months starting in November or December of 2008 is whether they reflect these adequate protection payments. It may be worth noting in this regard that three of the monthly operating reports starting with December of 2008 show net losses ranging from $9,820.77 to $4,088.61 per month.

We will assume for the sake of argument that these monthly operating reports reflect adequate protections of $3,603.00 and that this amount also will be available for

making monthly payments under the plan. The above shortfall will be reduced from $6,297.70 per month to $3,324.70 per month ($6,927.70 + $3,6003.00 = $3,324.70).

Instead of offering evidence at the hearing on plan confirmation which might show that the plan has a reasonable prospect of succeeding, debtors merely presented arguments.

In response to the objection of Cranberry Financial that their plan is not feasible, debtors asserted "Been there; done that!" at the confirmation hearing. This does not suffice. The fact that debtors have remained current on adequate payments to Cambria County Tax Claim Bureau and Cranberry Financial does not support a determination that they have a reasonable prospect of paying *all* classes of creditors in accordance with the plan.

Aside from asserting "Been there; done that!", debtors offered nothing at the confirmation hearing to show that they have a reasonable prospect of successfully reorganizing. For more, we must turn to their disclosure statement.

After indicating in the disclosure statement that rents paid by tenants in the commercial property totaled $4,748.33 per month, debtors stated that they are "actively negotiating with prospective tenants to occupy additional space in the commercial realty". Whether debtors had succeeded in finding additional tenants as of the hearing on plan confirmation was not indicated. Had they found additional tenants, we would expect debtors to have so informed the court.

Considering the economic straits in which the City of Johnstown, Pennsylvania, finds itself, we give little weight to debtors' assertion that they will find additional tenants in the near future. The assertion that they will find such tenants in the very near future is highly speculative. Conjectural, speculative and unrealistic assertions cannot support projections concerning future performance. *Matter of Canal Place, L.P.*, 921 F.2d 569, 579 (5th Cir. 1991).

Debtors also assert in their disclosure statement that the availability of federal economic stimulus funds for constructions projects, including public housing projects, bodes well for their cabinet-making business and should provide additional funds with which to meet their plan obligations. As was the previous assertion, this assertion is highly speculative and carries little weight. Whether the hoped-for influx of federal economic stimulus funds will result in more business for debtors' cabinet-making business is anyone's guess.

One final matter remains to be discussed concerning the feasibility of debtors' proposed plan.

While the central purpose of a chapter 11 proceeding is to facilitate reorganizations as opposed to liquidations, which generally are covered by Chapter 7 of the Bankruptcy Code, Chapter 11 expressly contemplates liquidations. *Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*, __ U.S. __, 128 S.Ct. 2326, 2331 n.2, 171 L.Ed.2d 203 (2008).

A chapter 11 plan may be confirmed only if it is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, *unless such liquidation or reorganization is proposed in the plan*. 11 U.S.C. § 1129(a)(11).

The proposed treatments of Classes 1, 3, 4, 6, 7, 8 and 12 in debtors' contain what may be characterized as "drop-dead" clauses. Creditors in these classes may take such action as the law permits to collect their claims if and only if debtors are more than sixty days in arrears on their obligations to them under the plan. Members of these classes may not take action to collect their allowed claims if debtors are not more than sixty days in arrears, but may do so if debtors are more than sixty days in arrears.

Considering the earlier determination that debtors almost certainly will fall far short at the outset of the amount required to meet their various obligations under the plan, the probability is equally high that members of these classes will be in a position before long to utilize the drop-dead provisions.

Take as an example Class 6, of which Cranberry is the sole member. The commercial property on which it has a mortgage lien is a primary source, if not *the* primary source, of the projected funds which debtors anticipate using to fund the plan.

If Cranberry Financial were to use its available remedies under the drop-dead provision and execute on the property, debtors' plan would collapse like a house of cards. Debtors also would not have sufficient revenues with which to pay other classes of creditors as provided for in the plan.

Under this scenario, all of debtors' assets except for those that have been exempted most likely would be liquidated and distributed to secured creditors in accordance with the priority of their liens. The outcome, in other words, would be similar to what it would have been had debtors not commenced their bankruptcy case.

Such drop-dead provisions do not *per se* qualify as liquidations for purposes of the final clause of § 1129(a)(11). If a drop-dead provision which provided for the liquidation of a debtor's assets in the event debtor defaulted under the plan suffices as a matter of law to render the plan feasible under § 1129(a)(11), a bankruptcy court would be required to find that an otherwise highly implausible plan nonetheless was feasible merely because it provided for the liquidation of the debtor's assets if and when debtor was no longer able to meet its obligations under the plan. *Danny Thomas Properties II, L.P. v. Beal Bank (In re Danny Thomas Properties II, L.P.)*, 241 F.3d 959, 963 (8th Cir. 2001). Something more is required to render such liquidations feasible for purposes of § 1129(a)(11). To hold otherwise would turn the concept of feasibility inside out.

A plan which provides for the liquidation of a debtor's assets in the event of a default may be feasible, however, if *the facts* underlying the plan reasonably establish that secured creditors will be paid in full. *In re Danny Thomas Properties II, L.P.*, 241 F.3d at 963 (citing *In the Matter of 203 North LaSalle Street*, 126 F.3d 955, 962 (7th Cir.), *reversed on other grounds, Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999);

and *In the Matter of T-H New Orleans Limited Partnership*, 116 F.3d 790, 803-04 (7th Cir. 1997)).

Debtors, who have the burden of proving by a preponderance of the evidence that § 1129(a)(11) is satisfied, in our estimation have *not* proved that there is a reasonable probability all classes of creditors having a secured interest in the commercial property will be paid the full amount of their allowed claims if debtors become more than sixty days in arrears on their obligations and the final clause of § 1129(a)(11) comes into play.

For instance, Cranberry Financial is the sole member of Class 6 and has a mortgage lien against the commercial property in the amount of $146,284.12. It is not, however, the only creditor with a lien against the commercial property. There also are numerous tax liens against the commercial property. Cambria County Tax Claim Bureau, the sole member of Class 1, has a tax lien in the amount of $209,874.07. IRS, the sole member of Class 7, has a tax lien in the amount of $105,722.23. Pennsylvania Department of Revenue, the sole member of Class 8, has tax liens totaling $35,667.23. The aggregate total of all these liens is $497,597.68 ($146,284.12 + $209,874.07 + $105,772.23 + $35,667.26 = $497,597.68).

Debtors asserted at the hearing on confirmation of their plan that the commercial property has a value of $490,000.00. They offered no evidence, however, to substantiate the assertion. The truth of the matter is that the value of the commercial property is not known. Moreover, there is a substantial probability that the property would fetch *considerably less* than $490,000.00 at a sheriff's sale due to the distressed nature of such

a sale. Considering the poor economic situation prevailing in Johnstown, where the commercial property is located, we would be surprised if the property turned out to be worth as much as debtors claim it is. It is at least as likely as not that the total amount of all the liens against it will exceed the value of the commercial property by a significant amount.

Even if we assume that the commercial property in fact has a value of $490,000.00, not all secured creditors with liens against the property would be paid in full in the event, say, Cranberry Financial executed on the property after debtors became more than sixty days in arrears on their obligation to it under the plan. The total amount of the liens would exceed the asserted value of the property by $7,597.68 ($497,597.68 - $490,000.00 = $7,597.68).

The outcome is not different if the liens of the taxing authorities also attach to debtors' residence. We have no basis for concluding that all of these lien creditors will be paid in full under debtors' plan in the event debtors become more than sixty days in arrears on their obligations under the plan and one of the taxing authorities exercised its legal remedies against the residential property.

Debtors' residence is subject to mortgage liens held by First National Bank totaling $73,271.70 ($4,806,98 + $68,464.72 = $73,271.70). The tax liens against the property total $141,439.49 ($105,772.23 + $35,667.26 = $141,439.49). Including the mortgage liens, all of the liens against debtors' residence total $214,711.19 ($141,439.49 + $73,271.70 = $214,711.19).

Debtors offered no evidence at the confirmation hearing concerning the value of the residential property. How much it is worth is anyone's guess. As a consequence, there is no basis for concluding that enough would remain from its sale to satisfy the liens of taxing authorities that would not be paid in full from a sale of the commercial property as well as the mortgage liens.

To summarize what we have determined to this point, debtors have not met their burden of proof concerning: (1) how much the commercial property is worth; (2) what portion of the liens against the commercial property likely would not be satisfied if the commercial property was sold; and (3) how much the residential property is worth; and (4) whether any tax liens which remain unpaid after the commercial property is sold would be paid in full along with the mortgage liens in the event debtors' residence also was sold.

As a consequence, debtors have not established that all of the secured claims in Classes 1, 3, 4, 6, and 8 will more likely than not be satisfied in the (highly likely) event that debtors become more than sixty days in arrears on their obligations under the plan to these classes. They have not, in other words, proved that the requirement which is implicit in the final clause of § 1129(a)(11) has been met.

One understandably might question whether we have been unduly rigid in arriving at the conclusion that debtors have not proved that their proposed plan qualifies under the final clause of § 1129(a)(11) and therefore is feasible. We think not.

It is a virtual certainty in out estimation that debtors will not be able to meet their obligations under the plan not long after its effective date. Because of this, we have taken a close look at whether debtors have proved, as they must, that all secured creditors will be paid in full once the drop-dead provisions come into play.

To do otherwise would vitiate the requirement set forth in § 1129(a)(11) that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the debtor. The requirement that a plan be feasible would be rendered nugatory and of trifling significance.

We conclude in light of all the foregoing that debtors' proposed chapter 11 plan cannot be crammed down in accordance with § 1129(b)(1) because the first of its above-enumerated requirements has not been satisfied. Not all of the requirements except for § 1129(a)(8) have been met. Specifically, § 1129(a)(11) has not been met.

There is no need in light of this last conclusion to address whether the requirement that the proposed plan be fair and equitable, the third of the above-enumerated requirement of 1129(b)(1), also has been met.

An appropriate order will issue.

_____
BERNARD MARKOVITZ
U.S. Bankruptcy Judge

Dated: 7-24-09

**FILED**

JUL 24 2009

CLERK, U.S. BANKRUPTCY COURT
WEST. DIST. OF PENNSYLVANIA

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| **ANTHONY S. TRIGONA and** | : | **Bankruptcy No. 08-70806 BM** |
| **KATHLEEN D. TRIGONA,** | : | |
| | : | **Doc. # 73: Plan of Reorganization** |
| | : | |
| **Debtors** | : | **Small Business Chapter 11** |

## ORDER OF COURT

**AND NOW**, this **24** day of **July**, 2009, for reasons set forth in the foregoing memorandum, it hereby is **ORDERED, ADJUDGED** and **DECREED** that debtors' proposed chapter 11 plan **SHALL NOT BE** and hereby **IS NOT CONFIRMED**. Debtors **SHALL** file an amended disclosure statement and chapter 11 plan no later than thirty days from the date of this order.

It is **SO ORDERED**.

_____
BERNARD MARKOVITZ
U.S. Bankruptcy Judge

cm:   James R. Walsh, Esquire
        Julia A. Wahl, Esquire
        Jonathan Babyak, Esquire
        Office of United States Trustee

FILED

JUL 24 2009

CLERK, U.S. BANKRUPTCY COURT
WEST. DIST. OF PENNSYLVANIA